**Richard W. DRAKE, Plaintiff,**

v.

**DELTA AIRLINES, INC., Defendant.**

**No. 94 CV 5944.**

United States District Court, E.D. New York.

April 26, 1996.

---

388

Richard W. Drake, pro se.

Ira Gregg Rosenstein, Orrick, Herrington & Sutcliffe, New York City, for defendant.

## MEMORANDUM AND ORDER

BLOCK, District Judge:

Plaintiff *pro se* Richard W. Drake ("Drake") commenced this action against defendant Delta Airlines, Inc. ("Delta") claiming that Delta violated his rights under the Federal Aviation Administration ("FAA") and Department of Transportation ("DOT") drug testing regulations and under the Fourth Amendment. Delta has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Delta's motion is granted and the complaint is dismissed without prejudice.

## BACKGROUND

Drake's complaint alleges few facts and is unintelligible in many respects. On the basis of the complaint alone, the Court would have no choice but to dismiss the action. However, since a *pro se* plaintiff is held to less stringent pleading standards, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972), the Court deems the complaint to include the facts contained in Drake's memorandum of law. *See Le Grand v. Evan*, 702 F.2d 415, 416 n. 3 (2d Cir.1983) ("The complaint ... contains few factual details of [plaintiff's] claims. However, details were provided in a 'memorandum of law' submitted with the complaint. In view of the cannon that a *pro se* litigant's papers should be liberally construed ... we read the complaint to adopt the factual allegations in the

memorandum."); *Alexander v. Coughlin,* No. 90 Civ. 3231, 1991 WL 150674, at *1 (E.D.N.Y. July 26, 1991) (Raggi, J.) (deeming complaint amended to include factual allegations asserted in plaintiff's memorandum of law); *Langert v. Festa,* 563 F.Supp. 692, 696 (E.D.N.Y.1983) (McLaughlin, J.) (same).

Drake was a Delta flight attendant who was required to undergo random testing for illegal drugs pursuant to regulations issued by the FAA and DOT ("FAA drug testing regulations"). On October 28, 1993, he submitted a urine sample to be tested by a laboratory, but the laboratory found the sample "unsuitable for testing."[1] Drake's sample was then sent to a second laboratory to determine if it had been adulterated. According to Delta, this additional test established adulteration and Drake was subsequently called into Delta's New York office and asked to resign. Upon his refusal to resign, he was fired and informed that he had a right to a hearing.

The hearing apparently consisted of two steps. First, Drake was provided with the opportunity to explain to a Delta employee the facts he thought were relevant to prove his innocence. Second, the Delta employee then presented the information the employee deemed relevant at a hearing Drake was not permitted to attend. Drake alleges that he was not provided with any information regarding the charges which resulted in his termination prior to his meeting with the Delta representative. In mid-February 1994, Drake was informed that this hearing had affirmed his termination.

Thereafter, Drake filed for unemployment benefits. He was initially denied benefits and requested a hearing before the New York State Unemployment Insurance Appeal Board. At this hearing, two Delta witnesses and a Delta attorney appeared, but "no proof [was] submitted by [Delta] that [Drake's] sample contained an adulterant." (Pl.Mem. of Law at 2.) According to Drake, the ALJ determined that his discharge was not due to misconduct in his employment, that he did not alter his urine sample, and that he should be awarded the maximum unemployment compensation.

Drake complains of violations of the FAA drug testing regulations.[2] He also alleges that Delta's testing of his urine sample for adulterants violated his rights under the Fourth Amendment. In his request for relief, he makes a number of demands, including reinstatement to his position as a Delta flight attendant, recovery of all lost back pay and benefits, and compensatory and punitive damages.[3]

In support of its motion to dismiss the complaint, Delta contends that it cannot be the subject of a private cause of action for allegedly violating the FAA drug testing regulations, and that the Fourth Amendment does not apply to its actions in testing Drake's sample for adulterants because it is a private employer and was not acting as an agent of the government. The Court agrees with Delta's first contention, but disagrees with Delta's second contention. The Court, however, deems the search for adulterants to be reasonable under the Fourth Amendment.

## DISCUSSION

### I. Is There a Private Right of Action for Violations of the FAA's Drug Testing Regulations?

█ The FAA drug testing regulations were promulgated under the authority of the

---

**1.** According to Delta, the lab subsequently informed it that there was reason to believe the sample had been adulterated with a substance used to disguise the presence of illegal drugs in a urine sample. Drake does not dispute that the lab relayed this information to Delta, but notes that the lab did not expressly make such a finding.

**2.** In sum and substance, Drake complains of the following violations of his rights under the FAA drug testing regulations: 1) Delta violated his right to be "randomly" tested when it tested his urine sample for adulteration rather than taking a new sample; 2) Delta violated his right to have

access to records relating to his drug test; and 3) Delta violated his right to have his sample remain secure. (Compl. at ¶¶ 1–5.)

**3.** Drake also seeks an order directing Delta to expunge all records contained in his employment file pertaining to the urine test in question, immediate cessation of all violations of the FAA drug testing regulations, and recovery of reasonable attorney's fees and costs. He requests compensatory damages in the amount of $50,000 per year for each year remaining until his retirement at age 65, and punitive damages in the amount of $2,000,000.

Omnibus Transportation Employee Testing Act of 1991 ("Testing Act") which, *inter alia,* amended the Federal Aviation Act, the Federal Railroad Safety Act, and the Commercial Motor Vehicle Safety Act to require drug testing for transportation workers in safety-sensitive positions. *See* Omnibus Transportation Employee Testing Act of 1991, Pub.L. No. 102–143, 105 Stat. 952 (1992). The Testing Act also placed Congress' imprimatur on drug testing regulations that had been promulgated in the 1980's by the administrative agencies governing the transportation industry, including regulations authorizing mandatory random testing issued by the FAA.[4] In this latter regard, the Testing Act required the mandatory testing of transportation workers in safety-sensitive positions throughout the transportation industry. Section 3 of the Testing Act, the portion which governs testing in the aviation industry, specifically directs the FAA to establish a program requiring air carriers to conduct drug testing of employees prior to their employment, upon reasonable suspicion, at random, and after accidents.[5]

The procedures currently used for the selection of employees to be tested, the collection of urine samples, and the testing of those samples are detailed in the FAA drug testing regulations which were issued pursuant to the directives of the Testing Act. 14 C.F.R. pt. 121, app. I (1995).[6] Employees who perform flight attendant duties are expressly included in the group subject to testing. 14 C.F.R. pt. 121, app. I(III)(B) (listing safety-sensitive positions subject to mandatory drug testing). The regulations which apply to flight attendants provide for mandatory random drug testing. 14 C.F.R. pt. 121, app. I(V)(C) (describing the percentages of employees who must be tested pursuant to the random testing provisions).

In *Salomon v. Roche Compuchem Lab., Inc.,* 909 F.Supp. 126 (E.D.N.Y.1995), the only reported case addressing the issue, Judge Johnson held that no private right of action exists to remedy violations of the FAA's drug testing regulations. *See 24 Hour Fuel Oil Corp. v. Long Island R.R. Co.,* 903 F.Supp. 393, 397 (E.D.N.Y.1995) (Trager, J.) ("Private causes of action are either explicit—a statute or regulation specifically states that individuals have a right to sue under them—or implicit—the apparent

---

**4.** Some of the drug testing regulations promulgated by administrative agencies prior to the passage of the Testing Act have been the subject of court challenges. For example, in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), railroad workers brought a Fourth Amendment challenge to drug testing conducted by private railroads pursuant to Federal Railway Administration regulations passed in 1985, which mandated drug testing after accidents and authorized drug testing "for cause." *Id.* at 608–12, 109 S.Ct. at 1408–10. The Supreme Court upheld the validity of both the mandatory and permissive provisions of these regulations finding them to be reasonable within the meaning of the Fourth Amendment. Similarly, in *Bluestein v. Skinner,* 908 F.2d 451 (9th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991), the Ninth Circuit upheld the validity of mandatory random drug testing conducted pursuant to pre-Testing Act regulations promulgated by the FAA in 1988. The application of mandatory random drug testing has also been approved outside the transportation industry. *See, e.g., Vernonia School Dist. 47J v. Acton,* —— U.S. ——, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding as reasonable random drug testing of students who participate in interscholastic athletics); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d

685 (1989) (upholding as reasonable random drug testing of federal customs officers who carry arms or are involved in drug interdiction). While Drake does not challenge the validity of the current FAA drug testing regulations and courts have not yet determined their constitutionality, *see Cronin v. Federal Aviation Admin.,* 73 F.3d 1126 (D.C.Cir.1996) (finding the regulations not ripe for review), it is unlikely that they would be found unconstitutional in light of *Skinner, Von Raab, Vernonia* and *Bluestein.*

**5.** The provisions of Section 3 were originally codified at 49 U.S.C.App. § 1434, but were subsequently recodified at 49 U.S.C. §§ 45101–45106, in a comprehensive, though unsubstantive, restructuring of Title 49 which occurred in 1994. *See* Pub.L. No. 103–272, 108 Stat. 745 (1994).

**6.** In promulgating its drug testing program, the FAA adopted the DOT procedures outlined in 49 C.F.R. pt. 40. *See* 14 C.F.R. pt. 121, app. I ("Each employer shall ensure that drug testing programs conducted pursuant to 14 CFR parts 65, 121, and 135 comply with the requirements of this appendix and the 'Procedures for Transportation Workplace Drug Testing Programs' published by the Department of Transportation (DOT) (49 CFR part 40).").

intent of Congress or administrative agencies is to have individuals use them to litigate."). In applying the appropriate analysis under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and its progeny,[7] Judge Johnson correctly noted that: 1) the enabling statute was silent with respect to the existence of a private right of action to enforce the regulations; 2) there was an administrative enforcement mechanism in place to address alleged violations of the regulations; and 3) no rights were created in the statute for a specific class of persons.

Indeed, under Part A, Subtitle VII of Title 49, Congress provided comprehensive administrative mechanisms for the enforcement of the FAA drug testing regulations and other aviation safety measures. *See* 49 U.S.C. § 46101, *et seq.* Amongst them is one that enables an individual to initiate an investigation by the Secretary of Transportation. Section 46101(a)(1) provides:

> A person may file a complaint in writing with the Secretary of Transportation ... about a person violating this part *or a requirement prescribed under this part* ... [T]he Secretary ... shall investigate the complaint if a reasonable ground appears to the Secretary ... for the investigation.

(emphasis added). In conducting such an investigation, the Secretary may subpoena witnesses and records related to a matter involved in an investigation, administer oaths, examine witnesses, and receive evidence. 49 U.S.C. § 46104. If the Secretary finds, after investigation, that a person is violating "this part," then the Secretary "shall issue an order to compel compliance." 49 U.S.C. § 46101(a)(4). Other administrative mechanisms include provisions authorizing the Secretary of Transportation to bring a civil action in federal court "to enforce this part or a requirement or regulation prescribed ... under this part," 49 U.S.C. § 46106, or request that the Attorney General bring a civil action to enforce a regulation prescribed under "this part." 49 U.S.C. § 46107.

These enforcement mechanisms are strong indicia that Congress did not envision a private right of action under the FAA's drug testing regulations and reinforce Judge Johnson's decision in *Salomon. See Chan v. City of New York*, 1 F.3d 96, 102 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993) (citing *Karahalios v. National Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 533, 109 S.Ct. 1282, 1286–87, 103 L.Ed.2d 539 (1989)) ("[W]here a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.... In such cases, '[i]n the absence of strong indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.' "); *Health Care Plan, Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 741 (2d Cir.1992) (no private right of action under 42 U.S.C. § 300e–9 where Congress envisioned an administrative rather than a judicial enforcement scheme); *Davis v. United Air Lines, Inc.*, 662 F.2d 120, 126 (2d Cir.1981), *cert. denied,* 456 U.S. 965, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982) (no private

---

7. In *Cort,* the Supreme Court set forth the following analysis to determine whether a private cause of action should be implied when a statute is silent in that respect:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. at 2087–88. Recently, the *Cort* test has been " 'refocused' by a series of Supreme Court decisions to emphasize the centrality of the second factor—congressional intent—and to treat the remaining factors 'only as proxies for legislative intent.' " *DiLaura v. Power Auth. of the State of New York*, 982 F.2d 73, 77 (2d Cir.1992) (citing *Health Care Plan, Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 740 (2d Cir.1992)). Courts in this Circuit, however, have continued to use all four *Cort* factors to guide their analyses. *See, e.g., DiLaura*, 982 F.2d at 77–78; *Health Care Plan*, 966 F.2d at 740; *Salomon*, 909 F.Supp. at 128; *Glendora v. Cablevision Sys. Corp.*, 893 F.Supp. 264, 267–68 (S.D.N.Y.1995).

right of action where Congress provided a "rather complete" administrative scheme to remedy violations of the statute).

Furthermore, Judge Johnson's conclusion that no rights were created in the statute for a specific class of persons is amply supported by the legislative history. The congressional findings set forth in the Testing Act state that "millions of the Nation's citizens utilize transportation by aircraft, railroads, trucks, and buses, and depend on the operators of aircraft, trains, trucks, and buses to perform in a safe and responsible manner[,]" and that "the greatest efforts must be expended to eliminate the abuse of alcohol and use of illegal drugs, whether on duty or off duty, by those individuals who are involved in the operation of aircraft, trains, trucks, and buses." Testing Act, Pub.L. No. 102–143, §§ 2(2), (3), 105 Stat. 952–53 (1992).[8]

The floor debates on the Testing Act likewise reflect a broad-based focus on public safety. Cosponsor Senator Hollings remarked: "It is critical that we take every step possible to improve transportation safety. By requiring drug and alcohol testing of safety-sensitive transportation workers, this legislation will significantly enhance the safety of the traveling public." 137 Cong.Rec. S6138 (daily ed. May 20, 1991). Echoing this sentiment was Senator Danforth, who set out the rationale for the Testing Act as follows:

> Mr. President, on January 4, 1987, a Conrail engineer and brakeman who were smoking marijuana ignored a series of stop signals near Chase, MD, and collided with an Amtrak train. Sixteen innocent people were killed—many of them college students. One hundred and seventy people were injured. The National Transportation Safety Board (NTSB) concluded that the Conrail engineer's marijuana impairment resulted in the worst accident in Amtrak's history.
>
> In response, Senator HOLLINGS and I have introduced and fought for the enact-

ment of legislation to require drug and alcohol testing of safety-sensitive transportation workers.

*Id.* *See* 137 Cong.Rec. E3077 (daily ed. Sept. 17, 1991) (statement of Rep. Coughlin) ("The potential for disaster created by those who abuse alcohol and illegal drugs while employed in safety sensitive transportation positions mandates that we do everything we can to eliminate the cause of the threat—before more innocent lives are lost.").

There is support, however, for the notion that Congress was also sensitive to the concerns of employees. For example, one of the findings in the Testing Act states:

> [A]dequate safeguards can be implemented to ensure that testing for abuse of alcohol or use of illegal drugs is performed in a manner which protects an individual's right of privacy, ensures that no individual is harassed by being treated differently from other individuals, and ensures that no individual's reputation or career development is unduly threatened or harmed.

Testing Act, Pub.L. No. 102–143, § 2(6), 105 Stat. 953 (1992). Furthermore, in commenting on the legislation, Senator Hollings noted that "[i]t both mandates testing to protect the public and includes strong safeguards to ensure accurate testing and to protect innocent employees." 137 Cong.Rec. S6138 (daily ed. May 20, 1991).

Nevertheless, looking at the legislation as a whole, it is clear that Congress in enacting the Testing Act intended to provide a general benefit to the public by increasing the level of passenger safety, and did not intend to establish a private right of action for the transportation industry's employees. *See Abate v. Southern Pac. Transp. Co.*, 928 F.2d 167, 169 (5th Cir.1991) ("It is true that railroad employees are a class that stands to gain some benefit from the regulations and penalties promulgated under these provisions. This fact alone, however, cannot suf-

8. The legislative findings accompanying the original passage of the Testing Act remain applicable even though the provisions which apply to the aviation industry have since been revised. The statement of purpose accompanying the 1994 revision notes that its purpose "is to restate in comprehensive form, without substantive change, certain general and permanent laws related to transportation and to enact those laws as subtitles II, III, and V–X of title 49, United States Code, and to make other technical improvements in the Code." S.Rep. No. 265, 103rd Cong., 2d Sess. 1 (1994).

fice to gain them a private right of action when the statute focuses on them only diffusely.").

Accordingly, Drake has no legally cognizable claim against Delta for its alleged violations of the FAA's drug testing regulations.[9]

## II. Did Delta Violate the Fourth Amendment by Testing Drake's Sample for Adulterants?

 There is no question, however, that a private right of action can be brought to remedy constitutional violations resulting from governmental action or private action that amounts to governmental action. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (the seminal case on the subject, implying a private cause of action for damages against federal law enforcement personnel who had violated plaintiff's Fourth Amendment rights); *1–95–CV–553–P1 v. 1–95–CV–533–D1,* 75 F.3d 135, 137 (2d Cir.1996) (*"Bivens* recognized the availability of a damages remedy for violation of constitutional rights in some circumstances."); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) ("In a *Bivens* action, alleged victims of constitutional violations by federal officials may recover damages despite the absence of any statute specifically conferring such a cause of action."); *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir. 1991) (same). As the Supreme Court explained in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), in assessing the application of the Fourth Amendment to private conduct:

Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument· or agent of the Government.

*Id.* at 614, 109 S.Ct. at 1411; *see United States v. Jacobsen,* 466 U.S. 109, 113–114, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971); *United States v. Bennett,* 709 F.2d 803, 805 (2d Cir.1983), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984); *United States v. Myerson,* 689 F.Supp. 312, 315 (S.D.N.Y.1988).

 When a private party acts pursuant to drug testing statutes or regulations that mandate its action, it is clear that the Fourth Amendment applies to its conduct because it is acting "by compulsion of sovereign authority." *Skinner,* 489 U.S. at 614, 109 S.Ct. at 1411–12; *see Bluestein v. Skinner,* 908 F.2d 451, 455 (9th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991) ("drug testing performed by private employers under compulsion of government regulations constitutes governmental action subject to constitutional restrictions."). In this case, the initial random drug test was performed pursuant to such mandatory provisions:

V. *Types of Drug Testing Required.* Each employer *shall conduct* the following types of testing in accordance with the procedures set forth in this appendix and the DOT "procedures for Transportation Workplace Drug Testing Programs" (49 CFR part 40).

14 C.F.R., pt. 121, app. I (mandating seven types of testing for persons performing safety-sensitive functions, including random testing). According to DOT procedures adopted by the FAA, employers are

require[d] ... [to] test for marijuana, cocaine, opiates, amphetamines and phencyclidine.

. . . .

(c) Urine specimens collected under DOT agency regulations requiring compliance with this part may only be used to test for controlled substances designated or approved for testing as described in this section and shall not be used to conduct

---

9. Although Drake does not have a judicial remedy, he could have availed himself of the provision of 49 U.S.C. § 46101(a) authorizing an individual to file a complaint with the Secretary of Transportation for violations of "a requirement pre-

scribed under this part." *See Cronin,* 73 F.3d at 1132 ("[A]n employee can file a complaint with the FAA if the specific testing procedures used violate the FAA's regulations.").

any other analysis or test unless otherwise specifically authorized by DOT agency regulations.

49 C.F.R. §§ 40.21(a), (c). Thus, if Drake were challenging Delta's initial test, the Fourth Amendment would be implicated because that test was mandated by the FAA's drug testing regulations. Drake, however, does not take issue with the initial test, but rather, challenges Delta's subsequent test for adulteration. This raises concerns regarding the applicability of the Fourth Amendment because adulterants are not one of the five substances for which drug testing is mandated, and thus, Delta was not *required* to conduct the subsequent test. Testing for adulterants, however, is recognized in the regulations:

> This section does not prohibit procedures reasonably incident to analysis of the specimen for controlled substances (e.g., determination of pH or *tests for* specific gravity, creatinine concentration or *presence of adulterants* ).

49 C.F.R. § 40.21(d) (emphasis added). Therefore, the regulations permit, but do not mandate, such testing.

■ When a private party acts pursuant to a permissive rather than a mandatory regulation or statute, a court must determine, "in light of all the circumstances," whether the private party was acting as a government agent. *Skinner,* 489 U.S. at 614, 109 S.Ct. at 1411–12 (citing *Coolidge,* 403 U.S. at 487, 91 S.Ct. at 2048–49); *see, e.g., Lebron v. National Railroad Passenger Corporation (Amtrak),* 811 F.Supp. 993, 996 (S.D.N.Y.) (First Amendment claim) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.") (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)), *rev'd,* 12 F.3d

388 (2d Cir.1993), *rev'd and remanded,* —— U.S. ——, —— – ——, 115 S.Ct. 961, 974–75, 130 L.Ed.2d 902 (1995) (holding that Amtrak "is part of the Government for purposes of the First Amendment."); *Mahoney v. National Org. for Women,* 681 F.Supp. 129, 132 (D.Conn.1987) (First and Fourteenth Amendment claims) (action can be maintained against purely private parties where "the defendants' actions were commanded or encouraged by the federal government or ... defendants were so intertwined with the government as to become painted with the color of state action."); *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1337 (9th Cir.1987), *cert. denied,* 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992) (First, Fourth, Fifth, Sixth, and Ninth Amendment claims) (the private status of a defendant will not serve to defeat constitutional claims provided that the defendant engaged in federal action).

In *Skinner,* for example, the challenged regulations contained both mandatory (Subpart C) and permissive provisions (Subpart D).[10] The Supreme Court held that the Fourth Amendment could be implicated by drug testing, even if it was conducted by private parties pursuant to permissive regulations, where "specific features of the regulations combine to convince [the Court] that the Government did more than adopt a passive position toward the underlying private conduct." *Skinner,* 489 U.S. at 614, 109 S.Ct. at 1411–12. The specific features in *Skinner* were that the Federal Railway Administration ("FRA") drug testing regulations pre-empted state laws, rules, or regulations covering the same subject matter; were intended to supersede any provision of a collective bargaining agreement; conferred upon the FRA the right to receive certain biological samples and test results procured by railroads pursuant to the regulations; and forbade a railroad to divest itself or other-

---

**10.** Subpart C, entitled "Post–Accident Toxicological Testing," is mandatory and provides that railroads "shall take all practicable steps to assure that all covered employees of the railroad directly involved ... provide blood and urine samples for toxicological testing by FRA" upon the occurrence of a "major train accident." *Skinner,* 489 U.S. at 609, 109 S.Ct. at 1408–09. Subpart D, entitled "Authorization to Test for

Cause," is permissive and authorizes railroads to require covered employees to submit to breath or urine tests in certain circumstances not addressed by Subpart C. *Id.* at 611–12, 109 S.Ct. at 1409–10. The FAA drug testing regulations at issue in this case require both of these types as well as additional types of testing. *See* 14 C.F.R. pt. 121, app. I(V)(A)–(G).

wise compromise by contract the authority to perform drug testing pursuant to the regulations. *Id.* at 615, 109 S.Ct. at 1412. The Court further noted that a covered employee could not decline his employer's request to submit to breath or urine tests under the conditions set forth in Subpart D and that an employee who refused to submit to the tests must be withdrawn from "covered service." *Id.*

After considering these features of the FRA's drug testing regulations, the Court concluded that the Fourth Amendment was implicated by the searches conducted pursuant to the permissive regulations of Subpart D, stating:

> In light of these provisions, we are unwilling to accept petitioners' submission that tests conducted by private railroads in reliance on Subpart D will be primarily the result of private initiative. The Government has removed all legal barriers to the testing authorized by Subpart D and indeed has made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions. In addition, it has mandated that the railroads not bargain away the authority to perform tests granted by Subpart D. These are clear indices of the Government's encouragement, endorsement, and participation, and suffice to implicate the Fourth Amendment.

*Id.* Although the Court detailed a number of specific features in reaching its conclusion, the Court did not suggest that its list was exhaustive or that any single feature was determinative. Rather, in making its evaluation under the totality of the circumstances and in highlighting the government's encouragement, endorsement, and participation in the permissive testing, the Court engaged in the typical "state action" inquiry traditionally employed to determine whether a private party's conduct is attributable to the government for the purpose of applying constitutional limitations. *See, e.g., Logan v. Bennington College Corp.,* 72 F.3d 1017, 1027–28 (2d Cir.1995) (federal and state due process claims) ("Characterizing a private party as a 'state actor' is a fact specific inquiry, and courts considering the issue typically look to

such factors as the public function of the party's conduct, whether the private party acted under state compulsion, the nexus between the party's conduct and the state, and whether the party's conduct was jointly undertaken with the state."); *Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1081 (2d Cir.1990), *cert. denied,* 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991) (Fourteenth Amendment due process claim) ("Private conduct qualifies as state action when '[t]he State has so far insinuated itself into a position of interdependence with [the private party] that is must be recognized as a joint participant in the challenged activity,' or when 'there is sufficiently close nexus between the State and the challenged action' that the private party's action 'may be fairly treated as that of the State itself.'") (quoting *Burton,* 365 U.S. at 725, 81 S.Ct. at 861–62); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974)); *Albert v. Carovano,* 824 F.2d 1333, 1340 (2d Cir.1987) (Fourteenth Amendment due process and equal protection claims) ("[A] private party becomes a state actor not only by state coercion but also when the State has provided 'significant encouragement, either overt or covert,' for the actions of the parties.") (citing *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982); *Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 2770–71, 73 L.Ed.2d 418 (1982)).

The cases in which courts have found no state action have invariably turned on minimal governmental involvement in the contested conduct. *See United States v. Keuylian,* 602 F.2d 1033, 1039–40 (2d Cir.1979) (Fourth Amendment not implicated in x-raying of checked luggage where FAA regulations did not require foreign air carrier to screen checked baggage); *Atkinson v. B.C.C. Assocs., Inc.,* 829 F.Supp. 637, 643–49 (S.D.N.Y. 1993) (drug testing program of private company performing work for public agency not subject to Fourth Amendment where drug testing program was not required by public agency); *see also Alliance for Community Media v. Federal Communications Comm'n,* 56 F.3d 105, 113 (D.C.Cir.1994) (finding no state action, and thus, no First Amendment violation where statute and regulations al-

lowed, but did not compel, the banning of indecent programs); *United States v. Ross,* 32 F.3d 1411, 1414 n. 1 (9th Cir.1994) (collecting cases holding that searches exceeding the guidelines of government security screening procedures are private searches); *Andrews v. Federal Home Loan Bank,* 998 F.2d 214, 217 (4th Cir.1993) (constitutional provisions did not apply where defendant's action was its own decision and not the product of coercion); *Parker v. Atlanta Gas Light Co.,* 818 F.Supp. 345, 347 (S.D.Ga.1993) (finding *Skinner* inapposite and the Fourth Amendment not implicated where statute at best represented a "passive position toward the underlying private conduct.").

After evaluating the totality of the circumstances, the Court concludes that Delta's search for adulterants did indeed implicate the Fourth Amendment. As in *Skinner,* the government has removed all legal barriers to the testing mandated or authorized by the FAA's drug testing regulations by pre-empting state or local laws on this subject. Section 45106(a) provides that "[a] State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this chapter." 49 U.S.C. § 45106. *See* 14 C.F.R. pt. 121, app. I(XI) ("The issuance of 14 CFR parts 65, 121, and 135 by the FAA preempts any state or local law, rule, regulation, order, or standard covering the subject matter of 14 CFR parts 65, 121, and 135, including but not limited to, drug testing of aviation personnel performing safety-sensitive functions."). The FAA's drug testing regulations, like the FRA regulations in *Skinner,* also provide for the sharing of certain information with the administrative agency. For example, 49 C.F.R. § 40.33(i)(1) calls for the disclosure of certain medical information to the FAA acquired by the employer in the testing verification process. Furthermore, an employee who refuses to submit to testing cannot be employed in a safety-sensitive position until the employee submits to a test which results in a verified negative result. 14 C.F.R. § 121.455(c) (forbidding a certificate holder from employing a person who has refused to submit to a drug test to perform a safety-sensitive function); 14 C.F.R. pt. 121, app.

I(V)(F) and (G) (outlining the steps an employer must take before returning an individual, who has refused to submit to a drug test, to duty in a safety-sensitive position); *see* 14 C.F.R. pt. 121, app. I(VI)(E) (directing employers to notify the FAA that employees holding certificates under parts 61, 63, and 65 have refused to submit to a drug test required under the FAA's drug testing regulations).

The regulations in this case do not present all of the features the Court found relevant in *Skinner,* such as precluding private actors from contracting away the right to perform the permissive tests. Nevertheless, since employers in the transportation industry have received the government's tacit approval to test for adulterants, *see supra* discussion of 49 C.F.R. § 40.21(d), Delta's search for adulterants here constituted a "sufficiently close nexus between the [act mandated by the] State[, random drug testing] and the challenged action[, testing for adulterants]" *Hadges,* 918 F.2d at 1081, such that Delta must be deemed to have effectively acted "as an agent or instrument of the Government." *Skinner,* 489 U.S. at 614, 109 S.Ct. at 1411–12.

■ Finding the Fourth Amendment implicated by Delta's search for adulterants, however, does not end the inquiry since the amendment prohibits only unreasonable searches. *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414. "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 ... (1985). Thus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quoting *Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396 (1979)).

■ To the extent that Drake retained any privacy interest in his urine sample after it had been tested the first time, that interest was minimal. There was no further physical invasion necessitated by testing his urine for

adulterants, or any involvement of Drake at all. The government, however, has a pervasive interest in encouraging transportation industry employers to prevent drug use by persons holding safety-sensitive positions. *See Skinner,* 489 U.S. at 634, 109 S.Ct. at 1422 (finding the drug tests mandated or authorized by the FRA were reasonable given the surpassing safety interests served by the tests); *Bluestein,* 908 F.2d at 456 (finding mandatory drug testing pursuant to pre-Testing Act FAA drug testing regulations to be reasonable where the government interest in preventing drug use by persons holding safety-sensitive positions in the aviation industry was "compelling"). If the search for adulterants were here proscribed, the FAA's drug testing mandate would be undermined and the purpose of the regulations—to enhance the safety of the flying public—would be compromised.

In testing for adulterants, Delta was acting consistent with Congress' implicit intent that employers in the transportation industry are to act as guardians of the public in drug testing their employees. So long as the actions of these "deputized" protectors of the public's well-being are reasonable, the protections afforded individuals under the Fourth Amendment will not be violated. The Court concludes that Delta's permissive search for adulterants, which plausibly and logically flowed from the mandatory drug test, was reasonable as a matter of law.

Accordingly, Drake has not pled a legally cognizable claim for violation of the Fourth Amendment.

### III. Does Drake State Any Other Claims?

Although Drake explicitly bases his complaint on violations of the FAA drug testing regulations and the Fourth Amendment, his complaint and memorandum seem to suggest other possible claims. For example, his allegation that he was held not culpable for his termination at the unemployment hearing suggests that his urine sample may not have been adulterated and that he may have been fired without cause; he also appears to complain about the nature of the hearing afforded him by Delta. It is premature, based on the limited allegations presently before the

Court, to determine whether or not Drake can allege a claim for wrongful termination, *see, e.g., Gargano v. Diocese of Rockville Centre,* 888 F.Supp. 1274, 1283–85 (E.D.N.Y. 1995) (Block, J.), *aff'd,* 80 F.3d 87 (2d Cir. 1996); *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 462, 443 N.E.2d 441, 443, 457 N.Y.S.2d 193, 195 (1982), *but see Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 506 N.E.2d 919, 920, 514 N.Y.S.2d 209, 211 (1987) ("It is still settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."); *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 300–302, 448 N.E.2d 86, 89–90, 461 N.Y.S.2d 232, 235–36 (1983), or for violation of his due process rights, *see, e.g., Board of Regents v. Roth,* 408 U.S. 564, 569–79, 92 S.Ct. 2701, 2704–10, 33 L.Ed.2d 548 (1972); *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995), and thus, the Court will give him an opportunity to do so. Accordingly, the complaint will be dismissed with leave to amend. *See, e.g., Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) ("We previously have stated that sparse pleadings by a *pro se* litigant unfamiliar with the requirements of the legal system may be sufficient at least to permit the plaintiff to amend his complaint to state a cause of action.") (citing *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994)); *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir.1989) ("district court abused its discretion in dismissing … *pro se* complaint without granting leave to file an amended pleading."); *Salahuddin v. Cuomo,* 861 F.2d 40, 43 (2d Cir.1988) (remanding case to district court for entry of an order allowing *pro se* plaintiff to file an amended complaint).

### CONCLUSION

Having determined that Drake's complaint fails to state a claim upon which relief could be granted for Delta's alleged violations of the FAA drug testing regulations and the Fourth Amendment, the Court dismisses those portions of the complaint with prejudice since there is no set of facts Drake could prove in support of those claims which would

entitle him to relief. *Branham*, 77 F.3d at 628 (dismissal is appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief.") (citation omitted). However, the Court grants Drake ninety (90) days in which to file an amended complaint setting out facts sufficient to state claims for wrongful termination and/or violation of due process.

**SO ORDERED.**