Richard W. DRAKE, Plaintiff,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, Kevin Wilson, Northwest Toxicology, Inc., David J. Kuntz, Elsohly Laboratories, Inc., Dr. William H. Whaley, and West Paces Ferry Medical Clinic, Defendants.

No. 02–CV–1924 FB RML.

United States District Court, E.D. New York.

Nov. 18, 2003.

Sam O. Maduegbuna, Esq., Maduegbuna Cooper, LLP, New York, NY, for Plaintiff.

Demetrios C. Batsides, Esq., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY, for Defendants Labo-ratory Corporation of America Holdings and Kevin Wilson.

Jeffrey Hurd, Esq., Phelan, Burke & Scolamiero, LLP, Albany, NY, for Defendants Northwest Toxicology, Inc. and David J Kuntz.

Sean P. Callahan, Esq., Devitt, Spellman Barrett, Callahan & Kenney, LLP, Smithtown, NY, for Defendant ElSohly Laboratories, Inc.

Ira Rosenstein, Esq., Orrick, Herrington & Sutcliffe LLP, New York, NY, for Defendant William H. Whaley.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Seeking compensatory and punitive damages, plaintiff Richard W. Drake ("Drake") brings this action pursuant to 42 U.S.C. § 1983 based on alleged violations of his Fourth and Fourteenth Amendment rights. He also asserts several state common law tort claims. Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants separately move to dismiss the federal claims for failure to state a claim, and jointly move to dismiss the state common law claims on the ground of federal preemption. In addition, defendants Northwest Toxicology, Inc. ("Northwest") and David J. Kuntz ("Kuntz") move, in the alternative, for summary judgment. For the following reasons, the federal, but not the state, claims are dismissed.

### PRIOR RELATED LITIGATION

In 1993, Drake was terminated from his employment as a flight attendant by his employer Delta Airlines ("Delta") because he purportedly failed a random drug test required by the Federal Omnibus Transportation Employee Testing Act ("OTE-

TA").[1] The present case marks his fourth litigation effort at vindication. The first was against Delta. One aspect of that lawsuit is still pending—the viability of the random selection process; all other claims have been rejected. The next two cases entailed a host of unsuccessful legal challenges against the FAA. In the current lawsuit, Drake sues those entities and individuals whom he claims were responsible for furnishing false drug information to Delta, which served as the basis for his termination.

In his first lawsuit, this Court construed Drake's *pro se* complaint as alleging a private right of action against Delta for violating FAA drug testing regulations, and a claim for the violation of his Fourth Amendment rights in the testing of his urine sample for adulterants. *See Drake v. Delta Airlines, Inc.*, 923 F.Supp. 387 (E.D.N.Y.1996). The Court dismissed the complaint in response to Delta's Rule 12(b)(6) motion. It held that Congress did not authorize a private right of action against an airline for violating FAA drug testing regulations. As for the Fourth Amendment, the Court determined that Delta must be viewed as acting as an agent for the government—even though a search for adulterants, unlike drugs, was permissive under the regulatory scheme, rather than statutorily mandated—but that the search was not unreasonable. In this latter regard, Drake's urine sample was initially found unsuitable for testing, but was sent to a second laboratory to determine whether it contained adulterants. According to Delta, this second test tested positive for adulterants, and was the reason for his termination. Although Drake did not refute this finding at a termination hearing, he claimed that his Fourth Amendment rights were violated because Delta failed to give him access to records pertaining to his drug test and secure his urine sample.

Applying Fourth Amendment jurisprudence, requiring the balancing of an intrusion on an individual's Fourth Amendment interests against the promotion of a legitimate governmental interest, the Court reasoned that "[t]o the extent Drake retained any privacy interest in his urine sample after it had been tested the first time, that interest was minimal" since "[t]here was no further physical invasion necessitated by testing his urine for adulterants or any involvement of Drake." *Drake v. Delta*, 923 F.Supp. at 396. After commenting that "[s]o long as the actions of [employers in the transportation industry] are reasonable, the protections afforded individuals under the Fourth Amendment will not be violated," the Court concluded "that Delta's permissive search for adulterants, which plausibly and logically flowed from the mandatory drug test, was reasonable as a matter of law." *Id.* at 397.

Although the Court dismissed the complaint, it *sua sponte* granted leave to amend since, liberally construed, Drake's allegations suggested the possibility of other claims. As the Court stated: "It is premature, based on the limited allegations presently before the Court, to determine whether or not Drake can allege a

1. Pub.L. 102–143, 105 Stat. 917 (Oct. 28, 1991), *modified* Pub.L. 103–272, § 1(e), 108 Stat. 1221 (July 5, 1994), *codified* 49 U.S.C. §§ 45101–106 (1994). Prior to the enactment of OTETA in 1991, the Federal Aviation Administration ("FAA") had required air carriers to randomly test employees in safety-sensitive positions; however the FAA was acting without a specific statutory mandate. OTETA provided this mandate by requiring random drug and alcohol testing in *all* transportation industries regulated by the Department of Transportation ("DOT"), including the FAA. *See* 49 U.S.C. § 45102(a). *See also* "Legislative and Regulatory History" *infra* pp. 367–371.

claim for wrongful termination ... or for violation of his due process rights." *Id.* Drake availed himself of this opportunity. In his second pleading, still acting *pro se,* he based a wrongful termination claim on allegations that Delta's real motive in firing him was because of his union activity, and predicated a due process claim on his contention, once again, that Delta had violated FAA drug testing regulations; in addition, he claimed that he was not afforded a proper termination hearing. The Court rejected both claims. *See Drake v. Delta Air Lines, Inc.,* 1997 WL 397498 (E.D.N.Y. Jul.10, 1997).

In regard to the wrongful termination claim, the Court found Drake's allegations of union bias to be conclusory; moreover, Drake was an at-will employee and Delta was not a state actor with respect to the employment action since "the decision to terminate an employee on the basis of a federally-mandated drug test is not one compelled by federal law and does not transform a private employer into a government agent." *Drake v. Delta,* 1997 WL 397498 at *4. As for the due process claim, the Court held that to the extent it was based upon Delta's failure to comply with FAA regulations, it must fail "because, as the Court made clear in its prior opinion, 'Drake has no legally cognizable claim against Delta for its alleged violations of FAA's drug testing regulations.'" *Id.* (quoting *Drake v. Delta,* 923 F.Supp. at 393). Finally, the Court rejected that branch of Drake's due process claim regarding the termination hearing, holding that "although Fourth Amendment protections attached to Delta's drug testing because it was acting as a government agent for that limited purpose, Delta did not act as a government agent in its subsequent decision to terminate Drake's employment." *Id.*

On appeal, the Circuit Court affirmed, "substantially for the reasons stated in [the district court's] opinions," the dismissal of "(i) Drake's claims based on Delta's alleged violations of drug testing regulations, because there is no implied private right of action for employees under those regulations; and (ii) Drake's statutory, common law, and constitutional claims based on Delta's allegedly wrongful termination of his employment because, *inter alia,* Drake was an at-will employee and Delta was not a state actor with respect to the employment action." *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170–71 (2d Cir.1998) (internal citation omitted). However, as to the Fourth Amendment claim, it remanded because Drake's first complaint "can be construed to allege that Delta's collection and first test of his urine sample were not administered within the parameters of its systematic testing program, and the record is silent (as is Delta) as to any basis, arising prior to the test's administration, for a reasonable suspicion that Drake was using drugs." *Id.* at 172.

Although Drake had no judicial recourse against Delta for its alleged violations of the FAA's drug testing regulations, the Circuit Court, agreeing with the District Court, noted that Drake "could have sought redress of the alleged regulatory violations through administrative avenues, such as by filing a complaint with the Secretary of Transportation." *Drake v. Delta,* 147 F.3d at 171 n. 2. Drake thereupon initiated, to no avail, two *pro se* litigations against the FAA in the District Court for the District of Columbia. As noted by the D.C. Circuit Court of Appeals in affirming the District Court's dismissals of these actions, the first case concerned the FAA's drug testing regulations "as a whole, and the related allegation that the laxity of these regulations may have allowed Delta to violate Drake's rights when it processed his urine sample;" the second

case principally attacked the FAA's subsequent determination "that Delta did not violate those regulations and the FAA's refusal to disclose information bearing on that determination." *Drake v. Federal Aviation Administration*, 291 F.3d 59 (D.C.Cir.2002).[2]

## PRESENT LITIGATION

While he was litigating his *pro se* claims against the FAA, Drake, now represented by counsel, initiated the present case against the entities and individuals involved in the testing of his urine.

### The Complaint

#### *Factual Allegations*

Drake commenced his employment with Delta in 1990. *See* Compl. at ¶ 6. On October 28, 1993, at Delta's request, Drake submitted a urine specimen to Delta to be tested for illegal substances. *See id.* at ¶¶ 32, 35. Delta split the specimen and sent one portion to defendant Laboratory Corporation of America Holdings ("LabCorp") for testing. *See id.* at ¶ 35.[3]

On November 2, 1993,[4] LabCorp notified Delta that the specimen "had an odor characteristic of an adulterant and suggested the presence of amphetamines." *Id.* at ¶ 37. LabCorp found the specimen "unsuitable for testing" and marked it "cancelled." *Id.* at ¶¶ 41, 42. Nevertheless, LabCorp tested the specimen; it did not find illegal substances. *See id.* at ¶ 44.

Defendant Kevin Wilson, a Senior Certifying Scientist employed by LabCorp., was the Certifying Scientist in respect to the handling and/or analysis of this test. *See id.* at ¶¶ 16, 17.

On November 4, 1993, LabCorp negligently sent some other employee's drug test results to Delta and defendant Dr. William H. Whaley ("Whaley"), who was Delta's Medical Review Officer ("MRO")[5] and an owner and employee of defendant West Paces Ferry Medical Clinic. *See id.* at ¶¶ 23, 46. On November 5, 1993, an employee at Delta "sent a facsimile transmission to [Whaley] indicating that Drake's specimen was *positive* for prohibited drugs. The statement, even though untrue, was circulated within Delta and soon became common knowledge within Delta staff and management." *Id.* at ¶ 47.

On November 15, 1993, LabCorp and Whaley "sent an aliquot of someone else's urine sample" to defendant Northwest, *id.* at ¶ 53, claiming that the urine sample was obtained from Drake; LabCorp failed to maintain a proper chain of custody and proper records of its testing of Drake's sample. *See id.* at ¶¶ 50–53. At that same time, "Northwest accepted an improperly documented aliquot of Drake's alleged urine sample, tested it, and conveyed false results to Delta and Whaley," *id.* at ¶ 55, since the test was found to be "negative for prohibited drugs." *Id.* at ¶ 55. Also on November 15th, Northwest tested the

---

**2.** The District Court dismissed the second case on *res judicata* grounds. In affirming, the Circuit Court reached the merits on these issues. The second lawsuit also alleged a claim under the Administrative Procedure Act, a *Bivens* claim, and a claim under the Federal Tort Claims Act. *See Drake v. FAA*, 291 F.3d at 69–73 (explaining reasons for rejecting each of these claims).

**3.** The complaint does not allege what happened to the other portion.

**4.** In referencing dates, as here, the complaint mostly refers to "on or about." For simplicity of presentation, the Court has simply referred to the date.

**5.** An MRO's duties are specified by federal regulations. *See generally* 14 C.F.R. pt. 121 App. I (FAA's drug testing regulations); 49 C.F.R. pt. 40 (DOT procedural rules incorporated by the FAA regulations). All regulatory referents made in Drake's complaint can be found in those sections.

same aliquot for glutaraldehyde,[6] and certified that this chemical was not present. *See id.* at ¶ 56.

On November 19, 1993, "Northwest sent the remainder of the aliquot of Drake's alleged urine sample" to defendant ElSohly Laboratories, Inc. ("ElSohly") for testing, without maintaining proper custody over the specimen. *Id.* at ¶ 57. ElSohly tested the aliquot on November 23, 1993. *See id.* at ¶ 60. It tested negative; however, ElSohly "conveyed unsubstantiated and improper speculation about the sample to Delta and Whaley." *Id.* at ¶ 61.

On November 19, 1993, Whaley sent a memo to Delta reporting his "*suspicions* of what *may* be in Drake's urine sample." *Id.* at ¶¶ 58–59. On November 24, 1993, Whaley sent another memo to Delta, which "acknowledged that no drugs or adulterants were found in Drake's alleged urine sample by any of the three labs (defendants LabCorp, Northwest and ElSohly), suggested that adulteration was still suspected, but warned that any further testing 'would violate the DOT Drug Testing Regulations.'" *Id.* at ¶ 63.

Nevertheless, on November 29, 1993, at Delta's direction and with Whaley's approval, Northwest "unlawfully purported to re-test Drake's alleged urine sample, and claimed that the re-test was positive for the presence of Glutaraldehyde." *Id.* at ¶ 64. Defendant Kuntz, the Director of Technical Operations at Northwest (but who Drake alleges was not a laboratory technician), performed the re-test, which was not properly documented or controlled. *See id.* at ¶ 65. Whaley and Northwest subsequently "accepted the false and improper results of the November 29, 1993 purported re-test and transmitted the results to Delta." *Id.* at ¶ 66.

Thereafter, "Delta accepted the false and improper results ... in total disregard of all earlier tests that found no adulterant in Drake's alleged urine sample," *id.* at 67, and suspended Drake on November 29, 1993. He was fired a month later, after refusing to resign. *See id.* at ¶ 70.

After being terminated, Drake promptly asked the defendants for records relating to the testing of his urine specimen; however, "all the defendant laboratories ... destroyed or claim to have lost all records of the testing, handling or analysis of [Drake's] urine sample, despite the fact that they knew and were duly notified that the testing of [his] urine sample was the subject of legal challenge and that the DOT Drug Testing Regulations required them to preserve, indefinitely, all records and samples which are the subject of such challenge." *Id.* at ¶ 74.

### Claims

In Count I, Drake claims that defendants, each of whom are alleged to be state actors, violated his Fourth Amendment rights because "[t]he DOT Drug Testing Regulations are in the form of a 'warrant' that is a necessary predicate for doing that which would otherwise constitute a deprivation of rights secured under the Fourth Amendment and 42 U.S.C. § 1983," and the defendants violated this "warrant" by

(a) failing to safeguard Drake's urine sample in the chain of custody and other violations of the chain of custody regulations; (b) ordering multiple identical tests; (c) alteration of the testing results; (d) failure to discuss the alleged positive result with Drake prior to transmitting information to Drake's employer; (e) permitting direct contact be-

---

**6.** Glutaraldehyde is "a substance often used to mask the presence of drugs in the body."

*Drake v. FAA,* 291 F.3d at 63.

tween the labs and the employer; (f) accepting and acting on test results of Drake's urine sample which were not processed in accordance with the DOT Drug Testing Regulations; (g) concealing the manner of testing, handling, and/or analysis of his urine sample.

*Id.* at ¶ 81.

In Count II, Drake claims that his due process rights were violated under the Fourteenth Amendment by the three testing laboratories, LabCorp, Northwest and ElSohly, because of their intentional destruction or inexcusable loss of their drug testing records, *see id.* at ¶ 85, and their failure "to safeguard Drake's urine sample in the chain of custody," all of which "impaired the ability of Drake to successfully challenge the drug test and the termination of his employment." *Id* at ¶ 86.

Counts III through VIII contain Drake's common law state claims. He charges the defendants with Negligence (Count III), Tortious Interference with Economic Relations (Count IV), Misrepresentation (Count V), Negligent Infliction of Emotional Distress (Count VI), Spoliation of Evidence (Count VII), and Conspiracy (Count VIII).

## DISCUSSION

In the face of a 12(b)(6) motion, all factual allegations of the complaint must be taken as true, and the Court cannot grant the motion if these allegations rise to the level of a cognizable claim. *See Flores v. Southern Peru Copper Corp.* 343 F.3d 140, 148 (2003) ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief.") (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## I. Fourth Amendment Claim

Defendants assert that Drake's Fourth Amendment claim "is nothing more than an attempt to circumvent this Court's prior holding dismissing his action against Delta for alleged violations of the FAA drug testing regulations." Defendants Memorandum of Law in Support of Motion to Dismiss Drake's Constitutional Claims ("Def. Mem. of Law") at 15. Furthermore, they maintain that "[e]ven if the Fourth Amendment were deemed implicated in this case, this Court has already determined that both the initial test and the subsequent test to isolate the adulterant which made the sample unsuitable for testing were reasonable as a matter of law." *Id.* at 17.

In response, Drake first points out that new facts materialized after the first litigation that neither this Court nor the circuit court knew of, namely: "(i) the 'negative' not 'positive' finding on the second test for adulterants; (ii) the fact of conflicting and inconclusive test results from Northwest and ElSohly; (iii) the break in the chain of custody as Drake's urine sample was shopped from lab to lab; (iv) the destruction by, and failure of, the defendants to preserve records relating to Drake's sample even when they knew it was under legal challenge; (v) the failure to preserve his urine sample for retesting; and (vi) the now confirmed alteration of the testing results." Memorandum of Law in Opposition of the Motion of Defendants to Dismiss Drake's Constitutional Claim ("Pl. Mem. of Law") at 8.[7]

7. According to Drake, these new facts, which apparently formed the basis for the detailed allegations in the complaint, came from three sources: limited discovery in *Drake v. Delta;* documents produced by Delta pursuant to an FAA directive in February 2000; and the DOT Inspector General's findings after investigation of Drake's drug test, memorialized in a

Given this new information, Drake asserts that the reasonableness of the defendants' conduct, as state actors, must be evaluated in assessing whether Drake's Fourth Amendment rights have been violated in order to determine, under the standard enunciated in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), whether the testing was part of "a systematic, uniformly applied testing program." Pl. Mem. of Law at 9 (quoting *Skinner*, 489 U.S. at 611, 109 S.Ct. 1402). In order to accomplish this, Drake maintains that "one must look to [the applicable federal regulations] as they provide the only yardstick against which the reasonableness of the tests, further testing and search for drugs and adulterants must be measured." *Id.* at 15–16.

In reply, defendants take issue as to whether they are state actors. In any event, they contend that their alleged failure to follow the regulations, and that the testing for adulterants allegedly rendered negative results, are "irrelevant to Drake's Fourth Amendment privacy interests," Defendants' Reply to Plaintiff's Memorandum of Law ("Def. Reply Mem.") at 7, since the Court previously determined that "Drake's privacy interest in the sample after Delta collected it was minimal." *Id.* at 8.

Although, as the decisions in *Drake v. Delta* teach, plaintiff is barred from bringing a private right of action against the defendants to enforce or challenge the application of the FAA's regulations, he is not barred from challenging the defendants' conduct in failing to comply with the regulations if that conduct rose to the level of a violation of his constitutional rights. Thus, in the Court's first decision in *Drake v. Delta*, after determining that Drake did not have a private right of action against

his employer, the Court considered his Fourth Amendment claim, insofar as it related to the second test, in the face of Drake's contentions that Delta deprived him of access to his drug test records and failed to secure his urine sample. In the present case, plaintiff, now aided for the first time by counsel, bottoms his Fourth Amendment challenge on a vastly expanded set of well-pleaded allegations. Giving these allegations their full breadth, they suggest either that someone else's test results were mistakenly reported to Delta, or that Drake's urine was not adulterated; neither of these contentions were advanced in *Drake v. Delta*. The complaint also expands on the nature and vast extent of the regulatory violations.

In essence, plaintiff appears to contend that when the integrity of the regulatory testing procedures have been so compromised as to lead inexorably to the wrong result, the Fourth Amendment is implicated. There is considerable superficial appeal to this contention and it is not at all surprising that one, such as Drake, who believes that he has been falsely accused of being a drug user in the course of his employment, would mount a decade of litigation to right this wrong. Nonetheless, vindication cannot come by way of the Fourth Amendment.

It is true that "[w]here the Government requires its employees to produce urine samples to be analyzed for evidence of illegal drug use, the collection and subsequent chemical analysis of such samples are searches that must meet the reasonableness requirement of the Fourth Amendment." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 678–79, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). However, as *Skinner* teaches,

report dated July 18, 2001. *See* Pl. Mem. in Opp. at 4, 6 n. 6, 8. *See also* DOT Inspector

General Report No. CC–2001–246 (July 18, 2001) (annexed to Pl. Mem. in Opp.).

"[o]btaining and examining the evidence" is only a search "if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner*, 489 U.S. at 616, 109 S.Ct. 1402. In making this assessment, "both the inception and the scope of the intrusion must be reasonable," *O'Connor v. Ortega*, 480 U.S. 709, 727, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); therefore, even if the inception of the search were reasonable, the court must consider "whether the search as actually conducted was reasonably related in scope in the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

Although Drake has challenged whether he was randomly selected for testing by Delta, he does not contend that his Fourth Amendment privacy rights were violated by the defendants in the collection process, *see, e.g., Kennedy v. City of New York*, 1995 WL 326563 *4 (S.D.N.Y. Jun.1, 1995) (plaintiff "allegedly ordered to urinate in his hospital room, in front of friends and relatives, including police officers"), and, as stated by this Court in *Drake v. Delta*, multiple testing of the single urine sample did not affect the nature of Drake's privacy interest in that "[t]here was no further physical invasion necessitated by testing his urine for adulterants or any involvement of Drake," 923 F.Supp. at 396; rather, his focus is on the testing procedures.

However inappropriate the implementation of these procedures may have been—even to the extent of reaching an incorrect result, they were limited to the lawful search for adulterants. This, then, was the scope of the intrusion and the basis for the chemical analyses to which Drake's legitimate expectation of privacy attached.

It would be otherwise if the testing or chemical analysis were used "as an occasion for inquiring into private facts unrelated to ... drug use," *Skinner*, 489 U.S. at 626, 109 S.Ct. 1402, such as whether Drake was an "epileptic" of "diabetic," *Id.* at 617, 109 S.Ct. 1402, since such analysis would be beyond the scope of legitimate intrusion. The defendants' conduct may well rise to the level of tortious behavior, *see Coleman v. Town of Hempstead*, 30 F.Supp.2d 356, 363–66 (E.D.N.Y.1999), but the Fourth Amendment cannot be used as the basis for furnishing a remedy under § 1983 for the violation of common law torts.[8] As aptly stated by the Second Circuit in *Singer v. Fulton*, 63 F.3d 110, 116 (2d Cir.1995):

> The Supreme Court has recognized that, '[i]n some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right' (citation omitted); still, it is only the violation of the constitutional right that is actionable and compensable under § 1983. 'The validity of the claim must [therefore] be judged by reference to the specific constitutional standard which governs that right ....' (citation omitted).

## II. Fourteenth Amendment Claims

■ Drake claims that the defendants' failure to preserve and maintain his records and urine sample, as required by FAA regulations, supports a due process claim because it deprived him of an opportunity to "challenge the drug test or pursue legal action." Def. Mem. of Law at 19. He further claims that by being falsely labeled a drug user, he suffered a loss of his Fourteenth Amendment liberty inter-

---

8. Given this determination, the Court need not consider whether, like Delta, defendants were state actors. One district court has de-

termined that the MRO and the testing labs are state actors. *See Coleman*, 30 F.Supp.2d at 362.

est to pursue his profession "free from stigma." *Id.* at 18.

In respect to the first claim, defendants argue that Drake cannot bottom a due process claim on the violation of FAA regulations because of the Court's prior determination that "any due process claim based on Delta's failure to comply with FAA regulations must fail because ...'Drake has no legally cognizable claim against Delta for its alleged violations of the FAA's drug testing [procedures],'" and the Court of Appeals' affirmance. Def. Mem. of Law at 12–13 (quoting *Drake v. Delta,* 1997 WL 397498, at *3). In respect to the stigma claim, defendants point out that it can attach only under the Fourteenth Amendment to the loss of a governmental job or to the deprivation of some other legal right or status, and argue that no such loss or deprivation occurred because they did not terminate Drake's employment; moreover, they rely on that part of the holding in *Drake v. Delta* that in terminating Drake, Delta was acting as a private, rather than a government, employer.

Without, once again, deciding whether the defendants were state actors, the Court concludes that Drake has not alleged a cognizable due process claim. By alleging that he was stigmatized and that defendants' conduct deprived him of an opportunity to challenge the drug test, Drake has alleged that he was denied *pro-*

*cedural* due process. To establish a procedural due process violation of the Fourteenth Amendment, a plaintiff must show that he possessed a protected liberty or property interest, he was deprived of that interest, and the deprivation occurred without adequate notice and an opportunity to be heard. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bross v. Turnage,* 889 F.2d 1256, 1257 (2d Cir.1989).

Drake has not alleged a cognizable claim for a loss of either property or liberty.[9] Plainly, the FAA regulations do not confer any property interests,[10] and, although Drake has clearly alleged that he has been stigmatized, *see, e.g., Guerra v. Scruggs,* 942 F.2d 270, 278 (4th Cir.1991) ("The stigma attached to a general discharge related to a drug offense is well documented."), he has not satisfied the "stigma plus" standard necessary to invoke a cognizable liberty interest. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). This means that, in addition to alleging defamation, a plaintiff must allege that "the defamation occurred in the course of the termination of governmental employment or was coupled with a deprivation of a legal right or status." *Id.* The loss of private employment coupled only with a "foreclosure of other employment opportunities" is insufficient. *Easton v. Sundram,* 947 F.2d 1011, 1016 (2d Cir.1991).

**9.** The liberty interest claim is not explicitly alleged in Drake's Fourteenth Amendment Claim, *see* Compl. at ¶¶ 84–87; it is, however, the focus of the due process aspect of his memorandum of law. *See* Pl. Mem. of Law at 18–21.

**10.** This is the purport of the Court's prior language in the *Drake v. Delta* lawsuit "that any due process claim based on Delta's failure to comply with FAA regulations must fail because ... 'Drake has no legally cognizable claim against Delta for its alleged violations

of the FAA's drug testing regulations.'" *Drake v. Delta,* 1997 WL 397498 at *3. Under Fourteenth Amendment analysis, it is the absence of a property interest, rather than the absence of a private right of action, that is the appropriate focus. In light of the Court's imprecise language, it is understandable why defendants would misconstrue it and, perhaps, why the Circuit Court's affirmance was only "substantially" for the reasons articulated in the Court's opinions.

Drake was not terminated from a government job since he "was an at-will employee and Delta was not a state actor with respect to the employment action." *Drake v. Delta*, 147 F.3d at 171; *cf. Kennedy*, 1995 WL 326563 (viable due process claim alleged where tenured public employee was terminated from public employment for failing drug test). The question then becomes whether the defendants' alleged defamatory actions were "coupled with the deprivation of some legal right or status." *Abramson*, 278 F.3d at 101. Although the Second Circuit has observed that outside the loss of government employment, "it is not entirely clear what the 'plus' is," *DiBlasio v. Novello*, 344 F.3d 292, 301 (2d Cir.2003) (quoting *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.1989)), the cases where it has addressed the issue provide some guidance. In *Neu*, for example, the court suggested that interference with one's license to practice a profession might constitute a legal right or status sufficient to satisfy a stigma plus claim, *see Neu*, 869 F.2d at 670 n. 3, and in *Valmonte v. Bane*, 18 F.3d 992 (2d Cir.1994), it found such a deprivation where an individual was unable to seek employment because of a "statutory impediment established by the state"—the inclusion of one's name in a Central Registry that must be consulted by child care employers. *Valmonte*, 18 F.3d at 1001. *See also Abramson*, 278 F.3d at 103 (union members not rehired by public benefit corporation running the Javits Center could not show deprivation of legal right or status); *Morris v. Lindau*, 196 F.3d 102 (2d Cir.1999) (demotion in government employment not a deprivation of legal right or status); *Easton*, 947 F.2d at 1017 (psychiatrist terminated from nonprofit entity because of, among other things, an investigation by the New York State Office of Mental Health was not deprived of legal right or status). There is no such comparable right or status in this case.[11]

## III. State Common Law Claims: Preemption

### A. The Preemption Provisions

Defendants have collectively moved to dismiss all the state common law claims on the ground that they are preempted by reason of federal statutory and regulatory preemption provisions.[12] Because federal

---

**11.** Drake has not raised a substantive due process claim. In any event, no such claim could lie against a state actor unless a plaintiff could demonstrate both that the official's conduct was conscience-shocking, *see County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), and that the official violated one or more fundamental rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)(internal citations and quotations omitted). Substantive due process claims have been restricted for the most part "to matters relating to marriage, family, procreation, and the right to bodily integrity," *Singer*, 63 F.3d at 115 (internal citation omitted), "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Chavez v. Martinez*, 538 U.S. 760, ——–——, 123 S.Ct. 1994, 2005–06, 155 L.Ed.2d 984 (2003) (citation omitted). Clearly, Drake's allegations, even if defendants are considered state actors, do not rise to a substantive due process level.

**12.** Defendants have not otherwise moved to dismiss the state claims. Thus, the Court has no occasion to determine whether they state cognizable claims or are barred by any particular defense, such as the statute of limitations. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("We consider each category of damages in turn. In doing so, we express no opinion on whether these actions are viable claims as a matter of state law; we assume *arguendo*, that they are.").

preemption is implicated, the Court retains jurisdiction to decide this issue even though the federal claims must be dismissed. *See Valencia v. Lee,* 316 F.3d 299, 306 (2d Cir.2003).

The preemption statute is section 45106(a) of OTETA:

> Effect on State and local government laws, regulations, standards, or orders. A State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this chapter. However, a regulation prescribed under this chapter does not preempt a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property.

49 U.S.C. § 45106(a).

In subsection (c), the FAA was authorized to "continu[e] in effect" pre-existing drug regulations. 49 U.S.C. § 45106(c). Prior to the enactment of OTETA, the FAA, in 1988, had established the following preemption regulation, which has been substantively continued to the present:

> XI. Preemption
>
> A. The issuance of these regulations by the FAA preempts any State or local Law, rule, regulation, order, or standard covering the subject matter of this rule, including but not limited to, drug testing of aviation personnel performing sensitive safety- or security-related functions
>
> B. The issuance of these regulations does not preempt provisions of State criminal law that impose sanctions for reckless conduct of an individual that leads to actual loss of life, injury, or damage to property whether such provisions apply specifically to aviation employees or generally to the public.

14 C.F.R. pt. 121, app. I § XI(A)-(B) (1988).[13]

Neither the Supreme Court nor the Second Circuit has yet to decide whether the federal drug testing laws and regulations preempt state common law tort claims. In decisions rendered just within the past year (one as recently as ten weeks ago), two circuit courts have, reaching conflicting results. *See Frank v. Delta Airlines, Inc.,* 314 F.3d 195 (5th Cir.2002); *Ishikawa v. Delta Airlines, Inc.,* 343 F.3d 1129 (9th Cir.2003).[14] Before discussing these cases, some explication of the basic principles governing preemption is indicated.

## B. Basic Principles of Preemption

Preemption has a dichotomous Constitutional nature. Because of the Supremacy Clause, U.S. Const., Art. VI, cl. 2, there is a presumption in favor of preemption in fields that are inherently federal in character and that the states have not traditionally occupied. *See Buckman Co. v. Plts'*

---

13. A non-substantive change occurred in 1994, when the FAA changed "these regulations" to specifically refer to 14 C.F.R. parts 65, 121, and 135, which were enacted in 1988, at the same time as the preemption provision. Part 121 contains the drug testing provisions at issue in this case.

14. A "sparse" number of district court decisions addressing the preemption of common law claims under OTETA and the FAA regulations, none of which are from the Second Circuit, are also "conflicting." *Rector v. LaBone, Inc.* 208 F.Supp.2d 987, 991 (E.D.Ark. 2002) (claims against laboratory either expressly or impliedly preempted). *See also Chapman v. LabOne,* 252 F.Supp.2d 814 (S.D.Iowa 2003) (claims against laboratory expressly preempted); *Howell v. Lab One, Inc.* 225 F.Supp.2d 1168 (D.Neb.2002) (field of drug testing completely preempted); *Hanson v. DrugScan,* 95 F.Supp.2d 868 (N.D.Ill.2000) (claim against laboratory not preempted); *Poole v. Burlington,* 987 F.Supp. 753 (D.Neb. 1997) (claim against employer not preempted).

*Legal Comm.,* 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). Because of the Tenth Amendment, there is a presumption *against* preemption of fields traditionally governed by the states, which obviously include common law torts; thus, "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption," and "preemption will not lie unless it is 'the clear and manifest purpose' of Congress." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (plurality opinion) ("[W]e 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'") (internal citation omitted).

"[S]tate laws can be pre-empted by federal regulations as well as by federal statutes," *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), and "the same [interpretive] principles apply." *Id.* at 715, 105 S.Ct. 2371.

Culling from Supreme Court precedent, the Second Circuit, in *Sprint Spectrum L.P. v. Mills,* 283 F.3d 404 (2d Cir.2002), has recently articulated the analytical framework as follows: Preemption can be express or implied. "Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field. Implied preemption occurs 'either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively ... or where state law is in actual conflict with federal law.'" *Id.* at 415

(internal citations omitted). Implied conflict preemption exists where "it is impossible for a private party to comply with both state and federal requirements ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Preemption, whether express or implied, may partially, as well as totally, displace state law.

> The inclusion in a federal statute of an express provision regarding preemption does not necessarily foreclose the possibility that aspects of a state law not expressly within the federal preemptive provision may be preempted by implication. Thus, a finding of implied preemption ... is not automatically foreclosed by the existence of a preemption clause. However, where the federal statute contains a provision explicitly addressing preemption, and when that provision provides a reliable indicium of congressional intent with respect to state authority, preemption is restricted to the terms of that provision.

*Id.*

Whether by statutory or regulatory fiat, language preempting any "law, rule, regulation, order or standard" could include the preemption of state common law that covers the same subject matter. *CSX,* 507 U.S. at 664, 113 S.Ct. 1732. This means more than that it "touch[es]" upon or "relate[s]" to that subject matter; it must "substantially subsume the subject matter of the relevant state law." *Id.*

"[A]ny understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose.*" *Medtronic,* 518 U.S. at 485–86, 116 S.Ct. 2240 (plurality opinion) (internal citation omitted). This is discerned "from the language of the preemption statute and the 'statutory framework' surrounding it." *Id.* at 486, 116

S.Ct. 2240 (internal citation omitted). Also relevant "is the 'structure and purpose of the statute as a whole' as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (internal citation omitted). While agency regulations are subject to the same scrutiny in order to glean their underlying purpose, there is a greater reluctance "to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes." *Hillsborough County,* 471 U.S. at 717, 105 S.Ct. 2371. As the Supreme Court explained:

> As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Id.*

Although these basic principles appear clear, discerning the requisite preemptive intent behind a preemption clause to determine whether recourse to state tort remedies are to be precluded has proven elusive. *See* Betsy J. Grey, *Making Congress Speak Clearly: Federal Preemption of State Tort Remedies,* 77 B.U. L.Rev. 559 (1997). Nothing better illustrates the degree of difficulty than the circuit court split regarding the interpretation to be accorded the federal and regulatory drug testing preemption provisions.

## C. *Frank* and *Ishikawa*

In holding that plaintiff's state-law tort claims were preempted, the Fifth Circuit in *Frank* found them to be expressly preempted by reason of the enactment by the FAA in 1988 of its preemption regulations, which have remained essentially intact through the years, coupled with Congress' reinforcement and confirmation of these regulations when it subsequently enacted OTETA

The court reasoned that, taken together, the statute and regulations "confirm the preeminence of FAA's drug-testing responsibility over any applicable state regulation," *id.* at 198, and that "[b]y overriding any state 'law, regulation, standard, or order' that is 'inconsistent' with FAA's regulations, Congress accomplished three things[:]"

> First, it supported the preemption, where necessary, of state common law negligence claims [citing *CSX,* 507 U.S. at 664, 113 S.Ct. 1732 for the proposition that "law, rule, regulation, order or standard" include common law negligence claims]. Second, it approved FAA's authority to issue pre-emptive regulations both before and after OTETA was passed, with the sole limitation against preempting certain state criminal law. Further, the narrow savings language implied a broad scope for federal preemption, since an exception for state criminal laws would hardly have seemed necessary if state law were only narrowly preempted.

*Id.* at 199 (internal citations omitted).

The court then rejected plaintiff's arguments that his claims were not "inconsistent" with FAA regulations, as required by the statute, and that, in any event, the "covering the subject matter" preemption in the FAA regulations required a narrow, rather than a broad, preemptive reach. In respect to the first argument, the court noted that "Congress expressly included the agency's pre-existing preemption regu-

lations among those that could be continued in effect." *Id.* at 199. As for the latter argument, the court relied on the fact that "the FAA preemption provision defines the preempted subject matter of the regulations as 'the subject matter of 14 CFR parts 65, 121, and 135, *including but not limited to,* drug testing of aviation personnel performing safety-sensitive functions.'" *Id.* at 201. Given this broad construction, reinforced by the identical savings clause in both OTETA and the FAA regulations "that exempts only state criminal laws from preemption, implying that state law claims are otherwise broadly preempted," *id.,* the court held that it need not determine whether the federal regulations "substantially subsume[d] the subject matter of the [state claims]." *Id.* (quoting and distinguishing *CSX,* 507 U.S. at 664, 113 S.Ct. 1732). Nonetheless, it determined, in the alternative, that each of the plaintiff's state claims were indeed substantially subsumed by the FAA regulations.

Notably, each of the state claims were only brought against Delta. In respect to the negligence claim, plaintiff alleged that Delta was negligent in utilizing the testing laboratory, LabOne, to administer the drug test since Delta "knew or should have known that LabOne administered improper tests and incorrectly interpreted the results." *Id.* at 201. The court determined that "the selection of a laboratory to perform drug testing of employees in safety-sensitive functions and the procedures" were substantially subsumed by FAA regulations. *Id.* The court employed a similar particularized assessment of plaintiff's intentional infliction of emotional distress and defamation claims and the regulations which it believed subsumed these claims.

In *Ishikawa,* the Ninth Circuit, without mention of the Fifth Circuit's decision in *Frank,* determined that plaintiff's state negligence claim, which was brought against the testing lab, LabOne, and not against Delta, was neither expressly nor impliedly preempted. As for express preemption, since the statutory preemption clause was limited to "inconsistent" state law, the court concluded that "[t]here is no express federal preemption by the statute." *Id.* at 1133. It did not view the second sentence of the statute, expressly *not* preempting described criminal law, as carrying "a negative pregnant that other state law is preempted," because "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.* (citing *Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608).

On the issue of inconsistency, the court "[could] not see how the duty the state common law imposed, that LabOne test urine and report the results with due care, could be inconsistent with the federal guidelines, which require the same thing with more specificity." *Id.* at 1132. Moreover, it discerned that "[t]he federal regulations implementing the federal drug testing program expressly preserve rather than preempt [an] employee's common law claims." *Id.* at 1133. In so holding, it pointed to a "broader and controlling set of regulations," undetected by the Fifth Circuit, "expressly providing that '[t]he employee may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling, or analysis of the specimen.'" *Id.* (citing 49 C.F.R. § 40.25(f)(22)(ii)(1998)). Consequently, the court concluded that it was "compelled to read [the regulatory preemptive language 'covering the subject matter'] as too narrow to preempt state common law negligence claims, because of the coequal regulation prohibiting the waiver of such

claims." *Id.*[15]

Having decided that plaintiff's negligence claims were not expressly preempted under the "covering the subject matter" regulation, the court then considered whether preemption could, nonetheless, be implied. It recognized, as the Second Circuit explained in *Sprint,* that there are two varieties of implied preemption: "Congress can implicitly preempt state law by 'occupy[ing] the entire field, leaving no room for the operation of state law.' State law can also be impliedly preempted if it conflicts with federal law, either through such a conflict that compliance with both is impossible, or where the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (internal citations omitted). It rejected each of these bases for implied preemption on the strength of the Supreme Court's decision in *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), noting that although Congress had generally occupied the field governing the standards for managing nuclear facilities, the Supreme Court nonetheless held that the Silkwood estate was entitled to pursue common law tort actions for compensatory and punitive damages because "Congressional 'silence' about 'recourse for those injuries' implied the contrary, that tort remedies were *not* preempted...." *Id.* at 1134 (quoting *Silkwood,* 464 U.S. at 251, 104 S.Ct. 615). As the court reasoned:

> Despite the sensitivity and federal concern with urine testing, it is no more delicate and important than federal regulation of nuclear facilities, and if a state common law tort action is permissible for the latter, *a fortiori* it is also permissible for the former. The common law

duty to exercise reasonable care to avoid harming people by negligence applies similarly to both. *Id.*

The court also rejected the other variety of implied preemption—"where 'compliance with both state and federal law would be impossible,' or where 'state law stands as an obstacle to the accomplishment of the full purposes and objective of Congress,'" *id.,* reasoning that "[i]f state law is not inconsistent, it cannot be impossible to comply with, and it cannot obstruct implementation of federal law, particularly where the regulations protect precisely such state law claims as the plaintiff brought." *Id.*

## D. Regulatory and Legislative History

There is significant regulatory and legislative history, which neither *Frank* nor *Ishikawa* has plumbed, that addresses whether the FAA or Congress sought to preempt state common law tort remedies.

### 1. 1988 Department of Transportation Interim Rule and 1988 FAA Final Rule

On September 15, 1986, President Reagan issued Executive Order 12564, entitled "Drug–Free Federal Workplace." 51 Fed. Reg. 32889 (Sept. 15, 1986). It required the head of each Executive agency to establish a drug testing program for agency employees in sensitive positions. *Id.* at 32890. It also authorized the Secretary of Health and Human Services ("HHS") to promulgate "scientific and technical guidelines for drug testing programs," and provided that "agencies shall conduct their drug testing programs in accordance with these guidelines once promulgated." *Id.*

---

**15.** The court alternatively held, without discussion, that the defendant laboratory "failed to demonstrate that the state common law negligence claims 'cover[ ] the subject matter of [the regulations].'" *Id.* at 1133.

at 32891. HHS promulgated such guidelines.

On November 21, 1988, the DOT, pursuant to its general regulatory authority, *see* 49 U.S.C. § 322, adopted a modified version of the HHS guidelines in an interim final rule, entitled "Procedures for Transportation Workplace Drug Testing Programs," to make them applicable to non-agency transportation industry employees. *See* 53 Fed.Reg. 47002 (Nov. 21, 1988) ("The Department of Transportation is adopting a modification of the Department of Health and Human Services' 'Mandatory Guidelines for Federal Workplace Programs.' The purpose of the modification is to adapt the procedures and safeguards developed by the Department of Health and Human Services more closely to the circumstances of drug testing programs in industries regulated by the Department of Transportation.").[16]

This interim final rule also contained the proscription against the waiver of negligence liability relied upon by the court in *Ishikawa:*

> When specified by DOT agency regulation or required by the collection site (other than an employer site) or by the laboratory, the employee may be required to sign a consent or release form authorizing the collection of the specimen, analysis of the specimen for designated controlled substances, and release of the results to the employer. *The employee may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling or analysis of the specimen or to indemnify any person for the negligence of others.*

53 Fed.Reg. 47002–01, 47008 (emphasis added).

On the very same day that the DOT's interim final rule was published, the FAA published a final rule, pursuant to "the FAA's statutory mandate to ensure aviation safety," 53 Fed.Reg. 47024, 47025 (Nov. 21, 1988), adopting the DOT's interim final rule. As the FAA explained: "[T]he Department of Transportation is publishing 'Procedures for Transportation Workplace Drug Testing Programs' which are adopted in this final rule in lieu of the [ ]HHS guidelines." 53 Fed.Reg. at 47026. In doing so, the FAA adopted the DOT's proscription against waiving negligence liability "on the part of any person participating in the collection handling or analysis of the [urine] specimen." 49 C.F.R. pt. 40, § 40.25(f)(22)(ii) (1988).

The 1988 FAA final rule also included the regulatory preemption provision at issue in *Frank, Ishikawa* and the present case. It was promulgated in response to the comments of the Air Transport Association of America, Federal Express, and the Regional Airline Association, that the "FAA insert a regulatory provision that explicitly proscribes State or local *legislation* that would interfere with the consistent and uniform testing and rehabilitation opportunities for aviation employees man-

---

**16.** Interim-final rules are "rules adopted by federal agencies that become effective without prior notice and public comment and that invite post-effective public comment. The adopting agency dispenses with pre-effective notice and comment in reliance on an exception to the Administrative Procedure Act's (APA's) normal rulemaking requirements." Michael Asimow, *Interim–Final Rules: Making Haste Slowly,* 51 Admin. L.Rev. 703, 704

(1999). They have the force of law, pending enactment of the final rule after the public has been given the opportunity for comment. *See e.g. Career College Ass'n v. Riley,* 74 F.3d 1265, 1268 (D.C.Cir.1996) (recognizing a Department of Education interim final rule with an effective date and a post-enactment comment period to be final and have the force of law).

dated by this final rule." *Id.* at 47048 (emphasis added). As the FAA explained:

The FAA agrees with the commenters who are critically concerned about conflicting State and local laws that would interfere with an effective comprehensive anti-drug program. The FAA believes that inconsistent laws or regulations applicable to the subject matter of this final rule will frustrate the intent of the rule and severely hamper implementation and administration of an anti-drug program. Therefore, the FAA has included a preemption provision in the final rule that is intended to enhance the efficiency and effectiveness of the requirements of the final rule.

*Id.*

Notably, in a statement concerning the federalism implications of the preemption provision, as required by Executive Order 12612, 52 Fed.Reg. 41685 (Oct. 26, 1987), the FAA stated:

The final rule adopted herein will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. *This rule preempts any State or local law that would prohibit or limit drug testing required under the rule.* This preemption, under the FAA's statutory authority, is essential to ensure that the safety benefits are obtained throughout the nation's air transportation system.

*Id.* at 47055 (emphasis added).

Thus, the avowed preemptive purpose was not aimed at barring suits for common law torts; rather, it was intended to prevent any state from prohibiting or limiting the drug testing required by the FAA.

## 2. 1989 DOT Final Rule

Ultimately, on December 1, 1989, the DOT, after responding to comments made to its interim final rule, which the FAA had adopted, promulgated its final rule. *See* 54 Fed.Reg. 49854 (Dec. 1, 1989). The DOT provision proscribing the waiver of negligence claims was not altered. The final rule added a number of regulations recognizing that the drug test results could be challenged in litigation. Specifically, they provided that "the MRO may reveal the quantitation of a positive test result to the employer, the employee, or the decisionmaker in a *lawsuit,* grievance, or other proceeding *initiated by or on behalf of the employee* and arising from a verified positive drug test," 49 C.F.R. pt. 40, § 40.29(g)(3) (1989) (emphasis added); that "the laboratory shall be required to maintain any specimens known to be under legal challenge for an indefinite period," 49 C.F.R. pt. 40, § 40.29(h) (1989); that "the laboratory shall maintain documents for any specimen known to be under legal challenge for an indefinite period." 49 C.F.R. pt. 40, § 40.29(m) (1989); and that the laboratory can only disclose the results of a positive drug test *"to the individual,* the employer, or the decisionmaker *in a lawsuit,* grievance, or other proceeding *initiated by or on behalf of the individual* and arising from a certified positive drug test." 49 C.F.R. pt. 40, § 40.35 (1989) (emphasis added).[17] *See also* 54 Fed.Reg.

---

**17.** As a consequence of a consolidation in 2000, the provisions in 49 C.F.R. pt. 40, § 40.29(g)(3)(1989) and 49 C.F.R. pt. 40, § 40.35 (1989), concerning the release of drug test information in legal proceedings, now can be found at 49 C.F.R. pt. 40, § 40.323 (2003); the provisions in 49 C.F.R. pt. 40, § 40.29(h) (1989) and 49 C.F.R. pt. 40, § 40.29(m) (1989), requiring laboratories to retain specimen and documents, can be found at 49 C.F.R. pt. 40, § 40.99(c) (2003) (specimen retention) and 49 C.F.R. pt. 40, § 40.109(c) (2003) (document retention). All of these provisions were amended without

at 49861, 49864 (explanatory comments). These provisions were added because "[t]he Department ... decided to broaden the scope of release of information in the context of legal proceedings." 65 Fed. Reg. 79462, 79475 (Dec. 19, 2000) (explaining the 1989 provisions).

### 3. 1991 Enactment of OTETA

Thus, when Congress enacted OTETA in 1991, requiring drug testing for *all* transportation workers in safety sensitive positions regulated by the DOT, the FAA regulations governing aviation industry employees were in place, including the preemption provision. Acknowledging the existence of these regulations, Congress specifically provided, in its own preemption section, that the FAA regulations could remain in effect, be amended or supplemented:

> This section does not prevent the Administrator from continuing in effect, amending, or further supplementing a regulation prescribed before October 28, 1991, governing the use of alcohol or a controlled substance by airmen, crewmembers, airport security screening employees, air carrier employees responsible for safety-sensitive functions (as decided by the Administrator), or employees of the Administration with responsibility for safety-sensitive functions.

49 U.S.C. § 45106(c).

Significantly, the Senate Report explained the *congressional purpose* behind the enactment of Congress' overlapping preemption provision as follows:

> Several States have *enacted legislation, or are considering doing so, to prohibit or restrict drug and alcohol testing of certain classes of individuals.* The

Committee is concerned that these restrictions may impinge upon the ability of the Administrator to ensure effective implementation of this section, and therefore the Committee is acting to preempt those restrictions.

S. Rpt. 102–54 at 23 (1991) (emphasis added).

Echoing the concern of the FAA when the agency adopted its preemption provision, Congress' intent, therefore, was simply to preclude the states from acting to prohibit or restrict drug (as well as alcohol) testing, and OTETA's reference to *inconsistent* state or local action should be read in that context.

### 4. 1994 FAA Final Regulations Implementing OTETA

Acting under the express congressional authorization conferred by OTETA allowing the FAA to continue in effect, amend, or supplement its pre-OTETA regulations, the FAA chose to retain intact the same preemption language contained in its 1988 regulations, except that, as previously noted, it made specific reference to 14 C.F.R. parts 65, 121, and 135. *See* n. 13, *supra.*

The FAA also reconfirmed its prior incorporation of the DOT's regulations: "Each employer shall ensure that drug testing programs conducted pursuant to 14 CFR parts 65, 121, and 135 complies with the requirements of ... the 'Procedures for Transportation Workplace Drug Testing Programs' published by the Department of Transportation (DOT) (49 CFR part 40)." 59 Fed Reg. 42922, 42928 (Aug. 19, 1994).

### E. Supreme Court Precedent

The high court's preemption decisions which inform the Court in determining

---

substantive change, except that a laboratory must now be given notice when a specimen is

under legal challenge.

whether OTETA or the FAA's drug testing regulations expressly or impliedly preempt common law tort claims run from 1984, with *Silkwood,* through its latest decision in 2002 in *Sprietsma.* In between are *English v. General Electric Company,* 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *Cipollone* (1992); *CSX* (1993); *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *Medtronic* (1996); *Geier v. American Honda Motor Company,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), and *Buckman* (2001). Although making sense of them is a challenge that "has left lower court decisions in disarray," Betsy J. Grey, *Making Congress Speak Clearly: Federal Preemption of State Tort Remedies,* 77 B.U. L.Rev. at 588, there are a number of common threads which aid the Court in resolving the present case:

1. None of the various preemption clauses in those decisions, no matter how broadly drawn, have been construed to expressly preempt all common law claims; nor have all common law claims ever been impliedly preempted.

2. A statutory or regulatory reference to the saving of common law claims is powerful indicia of intent that such claims cannot be expressly or impliedly preempted. *See Sprietsma,* 537 U.S. at 63, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (statutory reference); *CSX,* 507 U.S. at 670, 113 S.Ct. 1732 (regulatory reference).

3. When the Supreme Court has examined whether the common law "covers the subject matter" of a regulation or statute, it has taken a narrow view, consistent with the presumption against preemption of fields traditionally governed by the states. *See, e.g., CSX,* 507 U.S. at 667, 113 S.Ct. 1732 (narrowly interpreting the phrase in line with the Court's "considerable solicitude for state law"). Furthermore, common law claims are not "sub-

stantially subsumed" if they "could just as easily complement" a federal regulatory scheme. *Id.*

4. The Supreme Court has periodically railed against leaving plaintiffs who have been the victims of common law torts without a remedy for compensatory, and even punitive, damages. *See, e.g., Silkwood,* 464 U.S. at 251, 104 S.Ct. 615 (commenting, in declining to find punitive damages preempted for victims of nuclear accidents, that it is "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct,"); *Sprietsma,* 537 U.S. at 69, 123 S.Ct. 518 (ruling that "the concern with uniformity does not justify the displacement of state common-law remedies that compensate accident victims and their families and that serve the [Federal Boat Safety Act's] more prominent objective … of promoting boating safety."); *Medtronic,* 518 U.S. at 487, 116 S.Ct. 2240 (plurality opinion) (noting that Medtronic's [sweeping interpretation of a preemption statute silent about common law claims] would mean that "Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device," and calling such a result "perverse" because it would grant "complete immunity from design defect liability.").

5. The search for the underlying statutory or regulatory preemptive purpose is to ascertain whether "it was primarily concerned with the problem of specific conflicting state statutes and regulations rather than the general duties enforced by common-law actions." *Medtronic,* 518 U.S. at 489, 116 S.Ct. 2240 (plurality opinion).

The disarray which has challenged the lower courts in wading through the Supreme Court's decisions in the arena of common law preemption was spawned by

its dense opinions in *Cipollone*, prompting Justices Blackman and Scalia to comment "as to the difficulty lower courts will encounter in attempting to implement [the Court's] decision." *Cipollone*, 505 U.S. at 543–44, 112 S.Ct. 2608 (Blackman, J., concurring in part and dissenting in part); *id.* at 555, 112 S.Ct. 2608 (Scalia, J., concurring in part and dissenting in part) (quoting Justice Blackman). The following examples are representative of the bases for confusion engendered by the high court's decisions.

In *CSX*, in assessing whether regulations adopted by the Secretary of Transportation under the Federal Railroad Safety Act concerning warning devices at railroad crossings and certain train speed limits preempted common law negligence claims, the Court stated that "[l]egal duties imposed on railroads by the common law fall within the scope" of regulatory language preempting any state "law, rule, regulation, order, or standard relating to railroad safety." *CSX*, 507 U.S. at 664, 113 S.Ct. 1732. However, in *Sprietsma*, the Court viewed the terms *law* and *regulation* in the preemption clause in that case to "indicate that Congress preempted only positive enactments," reasoning: "If 'law' were read broadly to include the common law, it might also be interpreted to include regulations, which would render the express reference to 'regulations' in the pre-emption clause superfluous." *Sprietsma*, 537 U.S. at 63, 123 S.Ct. 518. And in *Freightliner*, it added to the conceptual puzzlement by casting uncertainty as to whether the term *standard* "pre-empts only state statutes and regulations, but not common law." *Freightliner*, 514 U.S. at 287 n. 3, 115 S.Ct. 1483.

Similar confusion has divided the Supreme Court as to the meaning to be ascribed to statutory language that preempts state "requirements." As noted in Justice Stevens' plurality opinion in *Medtronic*, "although [the Court] on prior occasions concluded that a statute preempting certain state requirements could also pre-empt common-law damages claims," *Medtronic*, 518 U.S. at 487–88, 116 S.Ct. 2240, citing to *Cipollone*, it should not be given such sweeping effect where it would produce "a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for the [plaintiff's] alleged injuries." *Id.* at 488–89, 116 S.Ct. 2240. Nonetheless, the Court's multiple opinions in *Medtronic* leave in doubt the circumstances under which the word "requirements" would pre-empt tort actions. *See id.* at 502–04, 116 S.Ct. 2240; *id.* at 503–05, 116 S.Ct. 2240 (Breyer, J., concurring in part and concurring in judgment); *id.* at 509–12, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part); *see also Geier*, 529 U.S. at 867, 120 S.Ct. 1913 (avoiding the necessity to determine "the precise significance of the use of the word 'standard' rather than 'requirement' ").

The confusion created by such examples underscores the importance of ascertaining the preemptive *purpose*. For example, in *Medtronic*, Justice Stevens, in his plurality opinion, in examining "the basic purpose of the legislation as well as its history," discerned that the preemptive language governing medical devices "simply was not intended to pre-empt most, let alone all, general common-law duties enforced by damages actions." *Medtronic*, 518 U.S. at 490–91, 116 S.Ct. 2240. As he explained: "There is ... nothing in the hearings, the Committee Reports, or the debates suggesting that any proponent of the legislation intended a sweeping pre-emption of traditional common-law remedies against manufacturers and distributors of defective devices." *Id.* at 491, 116 S.Ct. 2240.

The value of searching for the underlying congressional purpose behind preemptive language was at the heart of that part of *Cipollone* that ascertained that the purpose of the Federal Cigarette Labeling and Advertising Act of 1965 was to preclude the states from enacting "diverse, nonuniform, and confusing cigarette labeling and advertising *regulations* with respect to any relationship between smoking and health;" therefore, "the term 'regulation' most naturally refer[red] to positive enactments by those bodies, not to common-law damage claims." *Cipollone,* 505 U.S. at 519, 112 S.Ct. 2608. Similarly, as explained in *Buckman,* in allowing for common law damages to be recovered in *Silkwood,* the Court's decision "turned on specific statutory evidence that Congress disclaimed any interest in promoting the development and utilization of atomic energy by means that fail to provide adequate remedies for those who are injured by exposure to hazardous materials." *Buckman,* 531 U.S. at 352, 121 S.Ct. 1012 (quoting *Silkwood,* 464 U.S. at 257, 104 S.Ct. 615).

## F. Application

In the present case, both the statutory and regulatory language, and their collective underlying purpose, compel the conclusion that neither the preemption provisions nor the FAA drug testing regulations were expressly or impliedly intended to preclude *any* common law tort claims.

Initially, the statutory preemption speaks only in terms of "inconsistent" state provisos, and the regulatory preemption speaks in terms of such provisos "covering the subject matter" of the FAA's regulations. The Court simply cannot agree with *Frank* that taken together they mean that all common law claims are preempted; rather, even if this language be construed as being directed at common

law torts, it would only be torts that are inconsistent with or cover the same subject matter of a particular regulation that would be barred, suggesting that there would be torts that might not be barred.

Moreover, although neither the statutory nor regulatory preemption provisions expressly save common law claims, *cf. Sprietsma,* 537 U.S. at 63, 123 S.Ct. 518; *CSX,* 507 U.S. at 670, 113 S.Ct. 1732, the regulatory provision barring the waiver of liability "with respect to negligence on the part of any person participating in the collection, handling, or analysis of [a drug] specimen," 49 C.F.R. § 40.25(f)(22)(ii), is the functional equivalent of an express savings clause, and the court's reliance on this provision in *Ishikawa* in concluding that negligence claims were not preempted was certainly warranted.

Putting these two considerations to the side, the Court is of the view that the telltale search for the underlying purpose behind the statutory and regulatory preemption provisions reveals that they were never intended to impact any common law tort claims, but were only intended to bar *positive state enactments.* Unlike those cases where the legislative or regulatory purpose was not clearly expressed, Congress here explicitly stated that it was acting because it was concerned that "[s]everal States have enacted legislation, or are considering doing so, to prohibit or restrict drug and alcohol testing of certain classes of individuals." S. Rpt. 102–54 at 23. That the FAA was of a similar view is reflected in its statement addressing the preemption's federalism implications—that "it would not have substantial direct effects on the States," but would simply preempt "any State or local law that would prohibit or limit drug testing required under the rule." 52 Fed.Reg. at 47055. Thus, numerous FAA regulations recognize that there could be "lawsuit[s] ...

initiated by or on behalf of the employee ... arising from a verified positive drug test," 49 C.F.R. pt. 40, § 40.29(g)(3); *see also* 49 C.F.R. §§ 40.29.(h); 40.29(m); 40.35.

Given the reluctance to find preemption in fields traditionally governed by the states, the presumption against such preemption—requiring it to be "the clear and manifest purpose of Congress," *CSX*, 507 U.S. at 664, 113 S.Ct. 1732, the absence of any statutory or regulatory language expressly preempting common law claims, and the collective congressional and regulatory purpose for the preemption provisions, proscribing only *positive state enactments,* there is simply no basis to conclude that the preemption provisions were directed toward any common law tort claims. The same analysis militates against a finding of implied preemption, especially since an express preemption clause creates an "inference" that implied preemption is "foreclose[d]," *Freightliner,* 514 U.S. at 289, 115 S.Ct. 1483, because it shows that Congress never intended to occupy the entire drug testing field or place state common law torts in conflict with the federal law.

■ Even if the Court were to conclude that the preemption clauses could reach common law torts, it would nonetheless conclude that none of Drake's state claims are inconsistent with or covered by the subject matter of the drug testing regulations, i.e. "substantially subsume[d]." *CSX,* 507 U.S. at 664, 113 S.Ct. 1732. His negligence claims simply invoke the common law duty of due care. *See, e.g., Buckman,* 531 U.S. at 352, 121 S.Ct. 1012 (dis-

tinguishing *Silkwood* because it was based "on traditional state law principles"). As for the misrepresentation claim, predicated on defendants' fraudulent behavior, *see* Compl. at ¶¶ 118–129, "state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity." *Cipollone,* 505 U.S. at 529, 112 S.Ct. 2608 ("Thus, we conclude that the phrase 'based on smoking and health' fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements."). Drake's infliction of emotional distress claim seeks to punish intentional tortious behavior, and the regulations simply cannot be construed as sanctioning such conduct. *See, e.g., English,* 496 U.S. 72, 110 S.Ct. 2270 (common law claim for intentional infliction of emotional distress not barred by Energy Reorganization Act); *Silkwood,* 464 U.S. 238, 104 S.Ct. 615 (sanctioning punitive damages for intentional tortious behavior). Nor are there any regulations incompatible with Drake's claims for tortious interference with business relationships and spoliation.[18] As for the conspiracy claims—that defendants "acted in conspiracy to defraud Drake, violate Drake's constitutionally guaranteed rights, interfere with Drake's economic relations, and improperly use the DOT Drug Test Regulations to get rid of Drake," Compl. at ¶ 147, they are subject to the same analysis applicable to the underlying claims to which they attach. *See Demalco Ltd. v. Feltner,* 588 F.Supp. 1277 (S.D.N.Y. 1984) ("the gravamen of a claim of conspiracy is the underlying independent tort"); *see also Cipollone,* 505 U.S. at 530, 112

---

18. Although the Court assumes *arguendo* that Drake has alleged cognizable state claims, it notes that "[t]he New York Court of Appeals has yet to address the viability of a tort claim for spoliation of evidence;" however, "nearly every lower state court in New York to examine the issue, as well as decisions of federal courts construing New York law, have 'follow[ed] the majority view and do not recognize spoliation of evidence as a cognizable tort action.'" *Sterbenz v. Attina,* 205 F.Supp.2d 65, 71–72 (E.D.N.Y.2002) (internal citation omitted).

S.Ct. 2608 (applying same fraud analysis to conspiracy to commit fraud claim because they each share the same predicate duty).

In sum, what is common to all of Drake's common law claims is that they need not be dependent on the violation of any particular regulation; rather, they could be separately actionable based on traditional state tort law. *See Buckman,* 531 U.S. at 353, 121 S.Ct. 1012 (explaining that it was rejecting plaintiffs' fraud-on-the-agency claim because plaintiffs "would not be relying on traditional state law tort law which had predated the federal enactments in question," since the existence of the federal enactments were "a critical element in their case."); *Id.* at 352, 121 S.Ct. 1012 (distinguishing the claims in *Medtronic* because they "arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA requirements"). There is, simply put, no express or implied conflict between the federal regulatory scheme and the common law duties of those responsible for the accurate rendering of drug test results.

To hold otherwise would mean that drug testers would invariably be immunized from any compensatory liability for their misbehavior since, as *Drake v. Delta* teaches, there is no private right of action for the violation of the drug testing regulations, and, as shown in this case, constitutional claims will rarely be cognizable. In the absence of a constitutional violation, the sole recourse for one who has been wronged is to file a complaint with the FAA under 49 U.S.C. § 46101(a), *see Drake v. Delta,* 147 F.3d at 171 n. 2; however, "it is undeniable that [the FAA's] remedial powers are limited to cease and desist orders which can only proscribe fu-

ture violations," and "[i]t cannot grant damages for past wrongs." *Pinehurst Airlines, Inc. v. Resort Air Services, Inc.,* 476 F.Supp. 543, 548 (M.D.N.C.1979). Given the egregious nature of a false positive drug test report, this is simply not an acceptable remedy. It is inconceivable that Congress would want to bar- and it has not—one who has been falsely accused of illicit drug usage from seeking common law compensation from those responsible for devastating his or her life.

## IV. Retention of Jurisdiction Over State Claims

▇ The Court has considered all the factors set forth in the Second Circuit's recent decision in *Valencia,* governing the retention of supplemental jurisdiction in the face of the dismissal of all federal claims, and concludes that the values of judicial economy, convenience and fairness weigh in favor of keeping the case in federal court, and that issues of comity would not be offended in exercising jurisdiction over the plaintiff's basic, non-novel state law claims. *See Valencia,* 316 F.3d at 306. It would be an act of unkindness and a manifestation of judicial insensitivity to relegate Drake to yet another litigation in his decade-long odyssey in search of justice. While defendants Northwest and Kuntz have moved, alternatively, for summary judgment on all claims, there are no submissions supporting summary judgment in regard to the merits of the common law tort claims;[19] accordingly, the motion in that respect, is denied, without prejudice.

## V. Certification

▇ The district court and circuit court in *Frank* approved an interlocutory appeal

---

**19.** All that has been submitted is a copy of the pleadings. *See* Exhibits A and B attached to Aff. of Jeffrey Hurd dated October 29, 2002. While the Notice of Motion makes reference to an "annexed memorandum of law," Notice of Motion dated October 29, 2002, no such memorandum is contained in the official court file; nor has the Court located a copy.

pursuant to 28 U.S.C. § 1292(b). *See Frank*, 314 F.3d at 197. The Court believes this to be appropriate in this case as well, especially given the circuit split subsequent to *Frank*, and opines that the preemption issue "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).[20]

## CONCLUSION

Defendants' motions to dismiss the federal claims for failure to state a claim are granted; the joint motion to dismiss the state claims on the ground of preemption is denied. The Court retains jurisdiction over these claims, but certifies the preemption issue for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). The motion for summary judgment by Northwest and Kuntz in respect to the state claims, is denied without prejudice.

**SO ORDERED.**

---

**20.** Application for permission to appeal to the Court of Appeals must be made "within *ten days* after the entry of the [District Court's] order." 28 U.S.C. § 1292(b) (emphasis added),